UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| STEPHEN LEGRO and RENEE LEGRO,<br><br>                    Plaintiffs,<br><br>        v.<br><br>OFFICER NATHAN AYOTTE,<br>OFFICER ANGELO PAPADOPOULOS,<br>CORPORAL LOGAN TOMASETTI, and the<br>TOWN OF GILFORD.<br><br>                    Defendants. | Civil Action No. _____ |

## COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

NOW COME Plaintiffs, Stephen Legro (hereinafter "Mr. Legro") and Renee Legro (hereinafter "Ms. Legro"), by and through their attorneys, Shaheen & Gordon, P.A., pursuant to 42 U.S.C. § 1983 and New Hampshire law, suing the following law enforcement officers and municipal entity: Officer Nathan Ayotte ("Officer Ayotte"), Officer Angelo Papadopoulos ("Officer Papadopoulos"), Corporal Logan Tomasetti ("Corporal Tomasetti"), and the Town of Gilford, (collectively, "Defendants"), for violating their clearly established Fourth Amendment rights not to be subjected to excessive force, false arrest, and malicious prosecution; their Fourteenth Amendment rights to due process; and state common law claims.

Plaintiffs seek damages arising out of these serious constitutional violations.

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' federal causes of action arising under 42 U.S.C. § 1983 *et seq.* This Court has supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367.

- 1 -

2.      This Court may exercise personal jurisdiction over all Defendants because they resided or did business within the District of New Hampshire at all times relevant to this matter.

3.      Proper venue lies in the District of New Hampshire because a substantial part of the events giving rise to Plaintiffs' claims occurred in Gilford, New Hampshire. 28 U.S.C. § 1391(b).

## PARTIES

4.      Plaintiff Stephen Legro is a 54-year-old resident of Gilford, New Hampshire.

5.      Plaintiff Renee Legro is a 50-year-old resident of Gilford, New Hampshire.

6.      Officer Nathan Ayotte, at all times relevant to this lawsuit, was a police officer employed by the Town of Gilford Police Department. Officer Ayotte is, or was at all times relevant to this lawsuit, acting under the color of state law as a police officer employed by the Town of Gilford Police Department. Officer Ayotte is being sued in his individual capacity. At all times relevant to this lawsuit, Officer Ayotte was and is a "person" as that term is used by 42 U.S.C. § 1983.

7.      Officer Angelo Papadopoulos, at all times relevant to this lawsuit, was a police officer employed by the Town of Gilford Police Department. Officer Papadopoulos is, or was at all times relevant to this lawsuit, acting under the color of state law as a police officer employed by the Town of Gilford Police Department. Officer Papadopoulos is being sued in his individual capacity. At all times relevant to this lawsuit, Officer Papdopoulos was and is a "person" as that term is used by 42 U.S.C. § 1983.

8.      Corporal Logan Tomasetti, at all times relevant to this lawsuit, was a police officer employed by the Town of Gilford Police Department. Corporal Tomasetti is, or was at all times relevant to this lawsuit, acting under the color of state law as a police officer employed by the

Town of Gilford Police Department. Corporal Tomasetti is being sued in his individual capacity. At all times relevant to this lawsuit, Corporal Tomasetti was and is a "person" as that term is used by 42 U.S.C. § 1983.

9.      Defendant Town of Gilford is a municipal entity created under the laws of the State of New Hampshire. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. At all times relevant to this lawsuit, Defendant Town of Gilford was and is a "person" as that term is used by 42 U.S.C. § 1983. Defendant Town of Gilford is, or was at all times relevant, the public employer of Defendant Officer Ayotte, Officer Papadopoulos, and Corporal Tomasetti.

## FACTS

### Illegal Search

10.      On October 31, 2025, officers responded to a call from an anonymous male who claimed that there was an underage drinking party taking place at Plaintiffs' home in Gilford, New Hampshire.

11.      Gilford Police Department records show that dispatch entered the following information about the caller: "REFUSED MALE CALLING TO REPORT UNDER AGE DRINKING PARTY."

12.      Gilford Police Department records give no indication that the caller reported any concern beyond the alleged underage drinking party. There is no indication that the caller reported anything involving excessive noise, drugs, weapons, violence, imminent danger to any person, or even intoxication.

13.      Plaintiffs were not hosting an underage drinking party. Plaintiffs' daughter, a junior in high school, had invited around thirty classmates to Plaintiffs' home for a Halloween costume

party. Plaintiffs' daughter and her friends were in Plaintiffs' private residence, were supervised, and were not provided with alcohol.

14.     Plaintiffs have lived at the property for ten years.  Prior to October 31, 2025, law enforcement had never been called to the property.  Neither Plaintiff has a criminal record or arrest records.  Mr. Legro owns a successful business in the community.  Ms. Legro is a speech therapist who was unable to return to work due to the physical injuries and severe emotional distress caused by the Defendants.

15.     Upon information and belief, the anonymous caller who reported an "underage drinking party" was an individual who was upset that he or she was not invited to the Halloween party and wanted it broken up.

16.     Officers Ayotte and Papadopoulos, along with Corporal Tomasetti, (collectively, "the officers") responded to Plaintiffs' home, which is situated on a six-acre tract in a rural area, surrounded by conservation land, with very few other homes nearby.

17.     Each officer wore a body-worn-camera[1]. Corporal Tomasetti began recording at 10:17:53 p.m., Officer Papadopoulos began recording at 10:19:45 p.m., and Officer Ayotte began recording at 10:23:41 p.m.

18.     Corporal Tomasetti approached the front door of Plaintiffs' home, radioed to dispatch that "there's like 60 kids in this house," and asked for backup.

19.     At 10:18:42 p.m., Corporal Tomasetti radioed to Officer Papadopoulos, "9 to 21, go on the side, kind of where you were initially," and Officer Papadopoulos confirmed that he was in Plaintiffs' side yard, headed toward the back.

---

[1] The footage and audio recording from the officers' body-worn cameras are incorporated by reference in full herein and will be referenced and quoted throughout this complaint, as it is central to the claims.

20.     Corporal Tomasetti knocked on Plaintiffs' front door. In his report[2], Corporal Tomasetti wrote, "while doing so I observed over a dozen red solo cups, multiple cans that appeared to be soda, a shot glass next to a larger shot glass near the sink."

21.     Corporal Tomasetti's body-worn camera footage directly contradicts his report. No such items are visible on the footage while he knocks on Plaintiffs' front door. Corporal Tomasetti did not actually observe these items until 10:36 p.m., at a different door, eighteen minutes after he claimed to in his report, and after Plaintiffs had already been unlawfully arrested. At 10:36 p.m., Corporal Tomasetti approached the different door, while on the phone with Sergeant Eric Bredbury discussing probable cause, and told Sergeant Bredbury, "There are red solo cups, now that I look through the window here, there are some shot glasses, um, stuff like that, so I believe that I have probable cause to believe there's some sort of underage party here going on, but uh, that's just me." (emphasis added).

22.     After knocking on the door, Corporal Tomasetti proceeded around the side of Plaintiffs' house and met Officer Papdopoulos in Plaintiffs' backyard.

23.     The two officers spent the next several minutes circling the home, and making repeated radio communication discussing concerns about individuals leaving the home, but no individuals were chased, captured, or even depicted on the body-worn camera. In fact, neither officer ran, raised his voice, or even addressed any individual.

24.     At 10:19:57 p.m., Corporal Tomasetti radioed dispatch and asked for homeowner information on Plaintiffs' home.

---

[2] The officers' reports are incorporated by reference in full herein and will be referenced and quoted throughout this complaint, as they are central to the claims.

25.     Seconds after Corporal Tomasetti radioed asking for homeowner information, Officer Papdopoulos approached a door to Plaintiffs' home, and at 10:19:58 p.m., opened it, and peered inside.

26.     The below image is a screenshot taken from Officer Papdopoulos' body-worn camera at 10:19:59 p.m. which shows him opening the back door to Plaintiffs' home and peering inside:



27.     After opening the door and peering inside Plaintiffs' home, Officer Papadopoulos closed the door, knocked on the door he had just opened, and announced himself as "Gilford Police."

28.     At 10:20:15 p.m., just after Officer Papadopoulos had opened the door and peered inside on the other side of Plaintiffs' home, Corporal Tomasetti ascended the stairs to Plaintiffs' back porch and shined his flashlight in the windows.

29.    At 10:21:05 p.m., dispatch announced over the radio to the officers that the house is owned by Renee Legro and gave the officers her phone number.

30.    At 10:21:23 p.m., while on Plaintiffs' back porch, Corporal Tomasetti announced to nobody in particular, "It's too cold for this shit!"

31.    At 10:22:06 p.m., while standing on her back porch, Corporal Tomasetti attempted to call Renee Legro for the first time.

32.    Corporal Tomasetti wrote in his report that before he called Renee Legro, he "observed what appeared to be 3 pumpkin head beer cans inside[3]," and noted "There were 3 of them on a table in what appeared to be a living room[4]."

33.    Corporal Tomasetti did not observe the Pumpkinhead beer cans before he called Renee Legro. Half an hour later, at 10:52:21 p.m., after Plaintiffs had already been unlawfully arrested, while on the phone with the Chief of Police, Corporal Tomasetti looked inside a window of the home and told the Chief, "And actually as I look in the living room right now, there's a few Pumpkinhead beers, it looks like…" (emphasis added).

34.    After opening and closing the door, while Corporal Tomasetti was on Plaintiffs' porch, Officer Papdopoulos walked halfway around the circumference of Plaintiffs' home, from one side to another, and found himself at a door opposite the one he had just opened.

35.    There, body-worn camera footage shows that Officer Papadopoulos saw two young males near the door. Officer Papadopoulos wrote in his report, "As I approached this door, I saw

---

[3] Shipyard Pumpkinhead Ale is a seasonally-released wheat ale with a 4.5% ABV, described by the brewer's website as featuring "delightful aromatics and subtle spice flavor." https://shipyard.com/beer/pumpkinhead/. Three cans of Pumpkinhead Ale could hardly be described as evidence of an "underage drinking party" with "60 kids."

[4] The living room was marked "off-limits" to the children with Halloween "caution" tape, as was the upstairs of the home.

what appeared to be another three juveniles running from one room into the other." Body-worn camera footage does not show any individuals running.

36.    Officer Papadopoulos knocked on the door and announced himself.

37.    Seconds later, Stephen Legro calmly approached the door from inside the home and opened it.

38.    Before they had even made contact with Plaintiffs, the officers violated Plaintiffs' Constitutional rights under the Fourth Amendment to the United States Constitution and Part I, Article 19 of the New Hampshire Constitution by conducting an unlawful search of Plaintiffs' protected curtilage on their property and by opening the door to Plaintiffs' house without consent.

39.    Under the Fourth Amendment, "[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …."

40.    Under the New Hampshire Constitution, individuals are protected "from unreasonable police entries into their private homes, because of the heightened expectation of privacy given to one's dwelling." N.H. Const. Pt. I, Art. 19.

41.    Both New Hampshire and Federal law recognize that areas immediately surrounding a home (porches, yards, and other property intimately connected to the dwelling) are entitled to the same constitutional protection as the home itself.

42.    Although police officers may approach a residence under the limited "customary license" that allows visitors to walk to the front door, knock, and briefly wait to be received, that license does not permit officers to roam around the property, peer into windows, or open doors.

43.     Here, the officers exceeded that limited license by wandering through the Plaintiffs' yard, onto the porch, and around the front and rear of the residence, and by peering into windows and opening a door.

44.     Further, the officers did not have sufficient evidence to warrant an intrusion upon Plaintiffs' home, as they acted on an inadequately corroborated anonymous tip.

45.     Under both New Hampshire and Federal law, such tips require sufficient corroboration and specific, articulable facts indicating criminal activity before police may intrude.

46.     Because the officers lacked reliable information and failed to establish an ongoing threat to public safety, their search of the curtilage of Plaintiffs' property and subsequent actions were violations of the Fourth and Fourteenth Amendments to the United States Constitution and state common law.

The Assaults

47.     After Stephen Legro opened the door, at 10:22:01 p.m., the following exchange occurred:

OFFICER PAPDOPOULOS: "Good evening sir."
MR. LEGRO:                     "What's going on?"
OFFICER PAPDOPOULOS: "I'm Officer Papadopoulos, Gilford PD. Just so you know I'm recording, ok?"
MR. LEGRO:                      "Yes."
OFFICER PAPDOPOULOS: "We got a complaint of a party going on-"
MR. LEGRO:                     "From who?"
OFFICER PAPDOPOULOS: "-noise complaint[5], not sure, doesn't really matter... Got wind that there's underage -- possible underage drinking."
MR. LEGRO:                     "Ok."
OFFICER PAPDOPOULOS: "Do you have your ID on you by any chance sir?"
MR. LEGRO:                     "No."

---

[5] Gilford PD did not receive a noise complaint. As dispatch logs noted, Gilford PD received a call from an anonymous male, which the dispatch logs described as "REFUSED MALE CALLING TO REPORT UNDER AGE DRINKING PARTY." Moreover, Plaintiffs' home is isolated from other residences as described above. Further, no officer wrote – and no body-worn camera footage indicates – anything at all about noise coming from the home upon their arrival to the property and extensive search of the curtilage.

OFFICER PAPDOPOULOS: "Ok, I'll copy down your information. What's your full name?"

48.     Mr. Legro asked Officer Papadopoulos and Officer Ayotte, who had just arrived, if they wanted to come in, because it was cold outside.

49.     Mr. Legro was wearing a short-sleeved shirt and was not wearing socks or shoes.

50.     Officer Ayotte asked Mr. Legro if anybody was "around the back" of the house, and Officer Papadopoulos responded that nobody was "around the back" and he'd already checked.

51.     Mr. Legro calmly gave Officer Papdopoulos his name. Officer Papdopoulos began writing Mr. Legro's name down on his hand. Mr. Legro asked Officer Papadopoulos if he would like something to write on rather than his own hand. Officer Papdopoulos declined.

52.     As Officer Papadopoulos questioned Mr. Legro, at 10:23:05 p.m., Officer Ayotte began to wander around the side of the house and search Plaintiffs' curtilage, and the following exchange occurred:

| | |
|---|---|
| MR. LEGRO: | "Sir, can you come back … you don't have permission to-" |
| OFFICER PAPDOPOULOS: | "Date of birth, please." |
| MR. LEGRO: | "No." |
| MR. LEGRO: | "You don't have permission to search the house." |
| OFFICER PAPDOPOULOS: | "I need your information right now, ok? I need your information so I can get it in to dispatch." |
| MR. LEGRO: | "I'm the owner of the house." |
| OFFICER PAPDOPOULOS: | "I understand. I just need your date of birth-" |
| MR. LEGRO: | "I just told you. It's Legro. L-E-G-R-O" |
| OFFICER PAPDOPOULOS: | "Your date of birth. Your birthday. I'm asking for your birthday." |
| MR. LEGRO: | "I'm done. This is my house. You have my name." |
| OFFICER AYOTTE: | "Have you been drinking tonight, sir?" |
| MR. LEGRO: | "What does it matter? This is my house." |
| OFFICER PAPDOPOULOS: | "You look like you're under the influence of, uh, liquor right now, so, that's why he's asking…" |
| OFFICER AYOTTE: | "You understand that it is illegal…" |

- 10 -

53.     Mr. Legro was concerned about the safety threat that the presence of the officers presented to his daughter and her classmates due to the Gilford PDs aggressive and bulling behavior.

54.     His daughter and many of her classmates were dressed in Halloween costumes, some as "police" or other costumes which entailed various levels of disguise, and some carried "props," including fake weapons.

55.     Mr. Legro knew – and his daughter and her classmates knew – that the Gilford Police department had recently, on January 1, 2023, been involved in an incident in which a Gilford Police Sergeant fatally shot a teenager inside of a home.

56.     Officer Ayotte was involved in the January 1, 2023, incident.

57.     The New Hampshire Department of Justice disclosed Officer Ayotte's involvement in the January 1, 2023, incident to the public in a January 6, 2023, press release.

58.     Mr. Legro was also aware that the officers were conducting an illegal search of his property.

59.     The below image is a screenshot taken from Officer Papdopoulos' body-worn camera at 10:23:35 p.m., which shows Officer Ayotte stepping forward towards Mr. Legro, who is standing in his own doorway, and shining his flashlight in Mr. Legro's face while asking him if he'd been drinking:

- 12 -



60.    Against this backdrop, and because of the cold temperature, at 10:23:40 p.m., Mr. Legro calmly turned around to go back inside his house.

61.    The below image is a screenshot taken from Officer Papdopoulos' body-worn camera at 10:23:40 p.m., which shows Mr. Legro calmly turning to go back inside his house:



62.   After stepping back across the threshold to go back inside his own home, Mr. Legro began to calmly close the door.

63.   The below image is a screenshot taken from Officer Papadopoulos' body-worn camera at 10:23:41 p.m., which shows Mr. Legro calmly beginning to close the door to his home:

- 14 -



64.     Officer Ayotte immediately stepped across the threshold and forced his way inside Plaintiffs' house.

65.     The below images are screenshots taken from Officer Papdopoulos' body-worn camera at 10:23:42 p.m. and 10:23:43 p.m., respectively, which show Officer Ayotte stepping across the threshold and forcing his way inside Plaintiffs' house:





66.    Officer Papdopoulos followed Officer Ayotte into Plaintiffs' home.

67.    Mr. Legro told the officers, "Get out of my house."

68.    At 10:23:44 p.m., one second after forcing his way inside Plaintiffs' home, Officer Ayotte told Mr. Legro to "turn around put your hands behind your back," indicating that he was under arrest.

69.    Mr. Legro did not touch the officers, move towards the officers, or threaten them in any way.

70.    Mr. Legro repeated, "Get out of my house."

71.    At 10:23:47 p.m., Officer Ayotte radioed to Corporal Tomasetti, "one resisting."

72.    Corporal Tomasetti, who was still on Plaintiffs' porch, searching Plaintiffs' curtilage and shining his flashlight into windows, heard Officer Ayotte's radioed message and ran around the house to join the other officers.

73.    Mr. Legro told the officers, "nobody is resisting."

74.    At 10:23:51 p.m., Officer Ayotte grabbed Mr. Legro's left arm.

75.    The below image is a screenshot taken from Officer Papdopoulos' body-worn camera at 10:23:51 p.m., which shows Officer Ayotte grabbing Mr. Legro's left arm while Mr. Legro is not moving:



76.    Officer Papadopoulos joined in on the arrest, grabbing Mr. Legro's right arm.

77.    The below image is a screenshot taken from Officer Ayotte's body-worn camera at

10:23:54 p.m., which shows Officer Papdopoulos grabbing Mr. Legro's right arm:



78. Mr. Legro did not resist.

79. Officer Papdopoulos told Mr. Legro, "You're going to go to the ground in a second, Legro."

80. Immediately after making this threat, the officers bent and twisted Mr. Legro's arms, applying significant force.

81. The below image is a screenshot taken from Officer Ayotte's body-worn camera at 10:23:57 p.m., which shows Officer Ayotte raise Mr. Legro's left arm:

- 19 -



82.     The officers continued to apply force to Mr. Legro's arms.

83.     After raising Mr. Legro's left arm, Officer Ayotte used both of his hands to push Mr. Legro's left arm in towards the center of his body.

84.     The below image is a screenshot taken from Officer Ayotte's body-worn camera at 10:24:00 p.m., which shows Officer Ayotte using both of his hands to apply pushing force to Mr. Legro's left forearm:



85.     Officer Papdopoulos threatened Mr. Legro again, telling him again that he was going to go to the ground.

86.     At 10:24:05 p.m., as the officers continued to apply force to his arms, Mr. Legro told the officers, "Stop this, you are hurting my arms."

87.     Officer Ayotte's application of force to Mr. Legro's left arm caused Mr. Legro to suffer a comminuted medial condyle fracture in his left elbow, a traumatic fracture of the elbow caused by valgus stress (force pushing in to the center of the body).

88.     Mr. Legro also suffered injuries to his right elbow and to both of his wrists.

89.     At this same time, 10:24:05 p.m., Corporal Tomasetti turned the corner of the home and saw Officers Ayotte and Papadopoulos arresting Mr. Legro.

90.     Corporal Tomasetti drew his taser.

91.    At 10:24:08 p.m., while he was still jogging towards the door, with his taser drawn and his red and green dot sight engaged, Corporal Tomasetti yelled to Mr. Legro, "Hey! You better fucking listen pal!"

92.    The below image is a screenshot taken from Corporal Tomasetti's body-worn camera at 10:24:08 p.m., which shows Corporal Tomasetti holding his taser in his right hand, with red and green dot sight indicators on the ground in front of Mr. Legro:



93.    At 10:24:15 p.m., Officer Papadopoulos placed Mr. Legro in handcuffs.

94.    At the same time, Corporal Tomasetti said to Mr. Legro, "Not smart!"

95.    The below image is a screenshot taken from Corporal Tomasetti's body-worn camera at 10:24:19 p.m. which shows the officers still applying force to Mr. Legro's arms:



96.    Mr. Legro was breathing deeply, in obvious pain.

97.    At 10:24:32 p.m., Corporal Tomasetti told Mr. Legro, "Relax your arms so we can get you in cuffs."

98.    Mr. Legro responded, "I can't[6]."

99.    Officer Papdopoulos placed a second set of handcuffs on Mr. Legro.

100.    In his report, Officer Papdopoulos described how he applied force to Mr. Legro's arms: "I pressed my torso against Stephen's right arm, using more force to get his hand behind his back. While I pressed my torso forward against Stephen, my BWC mount detached from my uniform and fell to the ground facing upwards behind me. I told Stephen he would be going to the ground if he didn't relax. Stephen's upper body was hunched over by now, and his hands were in a

---

[6] Medial condyle fractures can cause instability, immobilization, and severely limited range of motion.

position where he could be secured in handcuffs; however, I still felt Stephen bracing his arm.

Based on how flexible I thought Stephen's shoulder was, I decided it was beneficial to place two

sets of handcuffs on him."

101.    After the officers placed Mr. Legro in handcuffs, the following exchange occurred:

OFFICER PAPDOPOULOS: "Well that wasn't smart!"
MR. LEGRO:                "What did I do? I said that you cannot come in to my house."
OFFICER AYOTTE:         "Tried to shut the door on our face-"
OFFICER PAPDOPOULOS: "We gave you a lawful order to give your date of birth to me, I asked you two times-"
MR. LEGRO:                "I don't have to do anything, this is my house-"
OFFICER PAPDOPOULOS: "-and then, you closed- tried to close the door on us."
MR. LEGRO:                "Because I said I was done talking to you."
OFFICER PAPDOPOULOS: "We're not done talking to you."
MR. LEGRO:                "So you have the right to come into my house for no reason?"
OFFICER PAPDOPOULOS: "It's not for no reason."
OFFICER PAPDOPOULOS: "It's not for no reason."
MR. LEGRO:                "What reason-"
OFFICER PAPDOPOULOS: "I provided you a reason. We got a noise complaint[7] of a party going on-"
MR. LEGRO:                "No you didn't!"
OFFICER PAPDOPOULOS: "- there might have been underage drinking involved, so we have to investigate. And I'm not going to sit here and argue with you about it, okay?"
CORPORAL TOMASETTI: "Are there kids in here drinking?"
MR. LEGRO:                "No."
OFFICER AYOTTE:         "There's definitely kids in here-"
CORPORAL TOMASETTI: "Then why did I see about 60 kids run-"
MR. LEGRO:                "They're in the playroom right there, go look in there"
CORPORAL TOMASETTI: "-right there, that way... you don't mind?"
MR. LEGRO:                "You can g- no. You cannot come in my house, because you have me in handcuffs right now."
CORPORAL TOMASETTI: "Okay. Alright. Okay."
CORPORAL TOMASETTI: "Who's house is this[8]? Is this your house? Is this an AirBnB?"
MR. LEGRO:                "We're done talking now."
CORPORAL TOMASETTI: "Alright."
MR. LEGRO:                "I already told you."

---

[7] Gilford PD did not receive a noise complaint. As dispatch logs noted, Gilford PD received a call from an anonymous male, which the dispatch logs described as "REFUSED MALE CALLING TO REPORT UNDER AGE DRINKING PARTY."

[8] At 10:21:05 p.m., just three minutes earlier, in response to Corporal Tomasetti's inquiry, dispatch announced over the radio to the officers that the house is owned by Renee Legro.

102.    Officer Papdopoulos told Mr. Legro that he was arrested because he did not comply with the "lawful order" to give Officer Papadopoulos his date of birth.

103.    New Hampshire law does not allow an officer to arrest an individual for refusing to provide his or her date of birth.

104.    "An officer may request the person's name and address, but the officer shall not arrest the person based solely on the person's refusal to provide such information." RSA 594:2.

105.    Officer Papdopoulos wrote in his report, "Ofc. Ayotte and I were detaining Stephen because he was interfering with our ability to determine if there were underage drinkers in the residence."

106.    Officer Papdopoulos, when he radioed dispatch to alert them of Mr. Legro's arrest, stated that Mr. Legro was arrested for "resisting."

107.    Officer Ayotte wrote in his report, "I stepped in and ordered him to place his hands behind his back because of his aggressive behavior," and, "Officer Papadopoulos was able to secure the other arm and was able to detain him in handcuffs, to ensure officer safety while conducting our investigation."

108.    No justification that the officers could provide for Mr. Legro's arrest, either contemporaneously or post-hoc, was legitimate.

109.    The officers did not have probable cause to arrest Mr. Legro.

110.    The officers did not have probable cause to enter the house.

111.    The officers used excessive force in arresting Mr. Legro, applying significant force to his arms and causing him to suffer a comminuted medial condyle fracture in his left elbow and other injuries.

112.    At 10:26:23 p.m., after Mr. Legro had been arrested and had his elbow broken, Renee Legro entered the foyer of the home where Mr. Legro and the officers were standing.

113.    Ms. Legro observed her husband in handcuffs, injured, and surrounded by three police officers in her home.

114.    Corporal Tomasetti asked her, "Are you Renee?"

115.    Ms. Legro responded, "Yes."

116.    Ms. Legro asked if they could all go outside, and the officers exited the home.

117.    At 10:27:03 p.m., Corporal Tomasetti, who stood just outside the doorway to Plaintiffs' home, began questioning Ms. Legro while she stood inside the doorway of her home, and the following exchange occurred:

| | |
|---|---|
| CORPORAL TOMASETTI: | "Are you able to talk with me out here or no?" |
| MS. LEGRO: | "Yeah, what do you want?" |
| CORPORAL TOMASETTI: | "Ok, just keep your hands out of your pockets for me." |
| CORPORAL TOMASETTI: | "Are there kids here?" |
| MS. LEGRO: | "My children are here." |
| CORPORAL TOMASETTI: | "Ok who else is here?" |
| MS. LEGRO: | "Nobody, what do you want." |
| CORPORAL TOMASETTI: | "Ok, you don't have other kids other than the few you have? How many kids do you have?" |
| MS. LEGRO: | "I'm sorry, what do you need?" |
| CORPORAL TOMASETTI: | "Well we got a call that there's a underage kids in here drinking, I saw a bunch of young individuals run from-" |
| MS. LEGRO: | "There's nobody here underage drinking" |
| CORPORAL TOMASETTI: | "-sprint that way, like 60 of them. Do you have 60 children?" |
| MS. LEGRO: | "There's nobody underage drinking, what do you need." |
| CORPORAL TOMASETTI: | "Nobody here is underage drinking?" |
| MS. LEGRO: | "No." |
| CORPORAL TOMASETTI: | "Ok, I did see a bunch of young kids, uhm, run that way the last time I saw them." |
| MS. LEGRO: | "I don't know who was running that way." |
| CORPORAL TOMASETTI: | "Okay, not 60 children?" |
| MS. LEGRO: | "I don't know what you saw. 60? No." |
| CORPORAL TOMASETTI: | "Approximately 60. You think it's funny but I literally saw them so I don't know why you're laughing. It's kinda wild." |
| MS. LEGRO: | "Ok, you just took my husband out of my house." |

CORPORAL TOMASETTI: "Yeah."

MS. LEGRO: "In bare feet."

CORPORAL TOMASETTI: "Yeah."

OFFICER PAPDOPOULOS: "Your husband made some poor decisions when we were trying to ask him what was going on."

MS. LEGRO: "Oh did he?"

CORPORAL TOMASETTI: "He also wouldn't let us get him shoes, so I don't know what you want me to do with the shoe situation."

MS. LEGRO: "What do you want?"

CORPORAL TOMASETTI: "I just want to talk to the kids who are here."

MS. LEGRO: "There's nobody here for you to talk to."

OFFICER PAPDOPOULOS: "Well now you're just lying to us."

CORPORAL TOMASETTI: "I saw them, so..."

MS. LEGRO: "There is nobody here for you to talk to!"

CORPORAL TOMASETTI: "Alright. We're going to need your information because right now I have probable cause to believe there is a crime occurring inside your residence."

MS. LEGRO: "There is not a crime occurring in my residence."

CORPORAL TOMASETTI: "Okay, well - do we have her info?"

OFFICER PAPDOPOULOS: "I believe so, but I want to double check."

CORPORAL TOMASETTI: "What's your name ma'am, because right now I suspect you of committing a crime, which is hosting an underage party."

OFFICER PAPDOPOULOS: "And let's not get into the same thing that happened with your husband, where he denied us information, and that's why he's in handcuffs at the moment."

MS. LEGRO: "Alright."

OFFICER PAPDOPOULOS: "So what's your name?"

MS. LEGRO: "So you guys can go -"

CORPORAL TOMASETTI: "Oh we need your info before we can leave."

OFFICER PAPDOPOULOS: "What's your name?"

MS. LEGRO: "I'm Renee. Goodbye."

CORPORAL TOMASETTI: "Renee what? We need your info."

118.   After this exchange, at 10:29:02 p.m., Ms. Legro calmly moved to close her door.

119.   As Ms. Legro calmly moved to close the door, Officer Papdopoulos, like Officer Ayotte had done minutes before him, stuck his arm in the door, blocked Ms. Legro from closing the door, and attempted to force his way inside Plaintiffs' house.

120.   The below image is a screenshot taken from Corporal Tomasetti's body-worn camera at 10:29:04 p.m. which shows Officer Papdopoulos sticking his arm in the door and attempting to force his way inside Plaintiffs' home:

- 26 -



121.    Ms. Legro told Officer Papadopoulos, "Don't touch my door!"

122.    As Ms. Legro was saying this, at 11:29:05 p.m., Corporal Tomasetti reached his right arm inside Plaintiffs' home and grabbed Ms. Legro and began to pull her out of her home.

123.    The below image is a screenshot from Officer Papdoipoulos' body-worn camera at 10:29:06 p.m. which shows Corporal Tomasetti reach his right arm inside Plaintiff's home, grab Ms. Legro, and begin to pull her out of her home:



124.    Corporal Tomasetti did not let go of Ms. Legro's arm.

125.    Officer Papadopoulos joined Corporal Tomasetti in pulling Ms. Legro out of her home.

126.    Ms. Legro yelled, "Hey! Let me go!"

127.    Together, Corporal Tomasetti and Officer Papdopoulos pulled Ms. Legro out of her home.

128.    The below image is a screenshot from Officer Papdoipoulos' body-worn camera at 10:29:08 p.m. which shows Corporal Tomasetti and Officer Papadopoulos pull Ms. Legro out of her home:

- 29 -



129.    The officers shoved Ms. Legro against the door and outdoor wall.

130.    The below images are screenshots from Officer Papdoipoulos' body-worn camera at 10:29:10 p.m. which show Corporal Tomasetti and Officer Papadopoulos shove Ms. Legro into the door and outdoor wall of her home:





131. The two officers grabbed and twisted Ms. Legro's arms.

132. The below image is a screenshot from Officer Papdoipoulos' body-worn camera at 10:29:15 p.m. which shows Corporal Tomasetti grabbing and twisting Ms. Legro's left arm, after he had pulled her out of her home and shoved her against her door and outdoor wall:



133. Ms. Legro yelled, "Ow! Ow! What the hell!" and "Please stop, you're hurting me!"

134. In response, Officer Papadopoulos told Ms. Legro, "Yup, it's going to hurt even more if you don't comply Renee!"

135. Corporal Tomasetti told Ms. Legro, "You're gonna go to the ground."

136. Ms. Legro repeated to the officers that they were hurting her.

137. Corporal Tomasetti wrote in his report that Ms. Legro was not under arrest when he pulled her out of her house, shoved her against her door and outdoor wall, and twisted her arms.

138.    Corporal Tomasetti wrote in his report: "It should be noted that I did not advise her she was under arrest, although I did tell her that she needed to give us her information before she left. After she was placed in handcuffs is when she was advised she was under arrest."

139.    Officer Ayotte joined the two officers. Corporal Tomasetti directed Officer Ayotte to "put cuffs on her."

140.    Officer Ayotte remarked, "This is just getting worse."

141.    As Officer Ayotte placed Ms. Legro in handcuffs, the following exchange occurred:

CORPORAL TOMASETTI:  "You're under arrest right now."
MS. LEGRO:                        "For what?"
OFFICER PAPDOPOULOS: "We needed your information."
MS. LEGRO:                        "I told you my name is Renee."
OFFICER PAPDOPOULOS: "Well, that's not enough information."
MS. LEGRO:                        "You're hurting me."
OFFICER PAPDOPOULOS: "Then relax!"
MS. LEGRO:                        "I can't!" You're bending my elbow backwards! It hurts!"

142.    The officers did not have probable cause to arrest Ms. Legro.

143.    The officers again performed an unlawful and unconstitutional arrest, as they just had on Mr. Legro, when they arrested Ms. Legro for not providing what they deemed to be "enough information."

144.    The officers again used excessive force, as they just had on Mr. Legro, in pulling Ms. Legro out of her house and arresting her.

145.    Officer Papdopoulos radioed dispatch and asked if they had "a Renee" as the owner of the home[9].

146.    Dispatch confirmed that Ms. Legro was the owner of the home.

---

[9] Dispatch had already notified the officers over their radios at 10:21:05 p.m., while the officers were searching Plaintiffs' curtilage, before the arrests, that Renee Legro was the owner of the home. Dispatch had already given the officers Ms. Legro's phone number, and Corporal Tomasetti had already attempted to call her while he was standing on her back porch.

147.    Officer Papadopoulos radioed in response that "she's also detained for resisting."

148.    Officer Papadopoulos' explanation to dispatch, that Ms. Legro was detained for "resisting," was in direct contradiction to the explanation he had given to Ms. Legro, seconds before, that she was arrested for not giving the officers "enough information."

149.    After Officer Papadopoulos radioed that Ms. Legro was arrested for "resisting," at 10:30:39 p.m., the following exchange occurred:

MS. LEGRO:              "I'm not resisting anything-"
CORPORAL TOMASETTI:  "You did resist-"
MS. LEGRO:              "I asked you to leave."
CORPORAL TOMASETTI:  "Textbook resisting right there. We needed your information, that's it, you were never under arrest 'til you resisted and failed to give us your information."

150.    Ms. Legro told the officers that her wrists hurt.

151.    At 10:31:16 p.m., Officer Papadopoulos opened the door to Plaintiff's home and entered the home.

152.    At 10:31:26, Corporal Tomasetti told Officer Papdopoulos to, "Stand by. You can close that again."

153.    At 10:31:43 p.m., Officer Ayotte struck Ms. Legro on her right arm.

154.    The below image is a screenshot from Officer Ayotte's body-worn camera at 10:31:43 p.m. which shows Officer Ayotte strike Ms. Legro on her right arm:

- 34 -



155. As a result of the officers' conduct, Ms. Legro suffered significant physical injuries to her wrists and arms, as well as a fundamental loss of rights and liberty, and serious mental injury.

156. At 10:31:46 p.m., after Ms. Legro asked the officers to adjust her wrists in the handcuffs, the following exchange occurred:

| | |
|---|---|
| MS. LEGRO: | "Stop bending my wrists. That hurts." |
| OFFICER AYOTTE: | "Do you want us to loosen this or not?" |
| MS. LEGRO: | "How many men are going to manhandle this woman?" |
| CORPORAL TOMASETTI: | "Two, unless you keep resisting." |
| MS. LEGRO: | "I think there's three here." |
| CORPORAL TOMASETTI: | "There's about to be a third on you if you don't stop." |

157. At 10:32:24 p.m., Officer Ayotte began walking Ms. Legro to a cruiser.

158. As Officer Ayotte brought Ms. Legro to the cruiser, the following exchange occurred:

| MS. LEGRO: | "These really frickin' hurt." |
| OFFICER AYOTTE: | "Well, they're not meant for comfort." |
| MS. LEGRO: | "Why are you hurting me." |
| OFFICER AYOTTE: | "Walk to the car!" |
| MS. LEGRO: | "Why are you hurting me?" |
| OFFICER AYOTTE: | "You haven't been hurt yet." |

<u>Illegal Entry</u>

159.    As Officer Ayotte brought Ms. Legro to a police cruiser, the officers began discussing the issue of whether they had probable cause to search the home.

160.    At 10:32:21 p.m., as Ms. Legro was being escorted to the cruiser, Officer Papadopoulos placed his hand on the knob of the door.

161.    Immediately thereafter, the following exchange occurred between Officer Papdopoulos and Corporal Tomasetti:

| CORPORAL TOMASETTI: | "Alright, so we're not just gonna blast through there, right." |
| OFFICER PAPDOPOULOS: | "Yeah. I was-" |
| CORPORAL TOMASETTI: | "We don't have any, uhm, you know indication to believe that these kids are in any danger, right." |
| OFFICER PAPDOPOULOS: | "Right" |
| CORPORAL TOMASETTI: | "They've probably been drinking, we don't even know if they have been. We just believe that they have based on the call, based on them, and based on what I witnessed, which was that they sprinted that way. Literally 60 of them. So, uh, let me make a phone call, and then we'll go from there. I'm not super comfortable walking around this entire house just for a couple kids who may be drinking, because that's all we have right now. We have probable cause, but that doesn't mean we can just blast through there yet." |

162.    Corporal Tomasetti's observation that the officers did not have any indication to believe that any children inside the home were in any danger stands in direct contrast to what each officer later wrote in his report.

163.   Corporal Tomasetti wrote several contradictory and self-serving statements in his report in a post-hoc attempt to justify the officers' behavior by claiming that the children in the home were in danger, including:

- During the improper curtilage search, "I stayed on my side of the residence, as I feared the young individuals would attempt to escape if I left, putting them in potential danger as it was very cold and I believed at least some of them to be impaired based on their behavior and what I observed inside the residence up to this point."

- After Mr. Legro was arrested, and his elbow broken, "It should also be noted that the state Stephen was in, it would be unreasonable to believe he alone could take care or watch over the amount of young individuals I initially observed inside the residence. This made me fear more for the individuals inside the residence, if they were impaired. They could easily leave and get into the one of many vehicles directly outside the residence or get sick inside and pass out or any number of issues that are caused when consuming alcohol."

164.   Officer Papadopoulos wrote several contradictory and self-serving statements in his report in a post-hoc attempt to justify the officers' behavior by claiming that the children in the home were in danger, including:

- Upon arrival, "When I exited my cruiser, I noticed approximately a dozen vehicles parked on the roadway in front of the lawn of the residence and several more vehicles in the driveway. This was concerning because if there

was an underage party in progress, there's more likely to be intoxicated drivers leaving the residence."

- After describing Officer Ayotte's forcible entry into Plaintiffs' home after the officers' exchange with Mr. Legro, "Stephen likely intoxicated from alcohol and not answering questions that I was asking him was concerning because I was concerned that there were underage drinkers in the residence that could have their safety compromised. These safety concerns included, but weren't limited to, an underage drinker incapacitated from overdrinking, vomiting in the toilet, and being so dizzy or clueless that they stumble out of the residence into the cold, getting lost in the woods."

- "If Stephen was able to close the door on Ofc. Ayotte and I, our response time to locate and assist any underage drinkers that suffered from the overconsumption of alcohol would have been too slow."

- Upon contact with Ms. Lego, "It should be noted that Renee and Stephen were the only adults I had contact with from the residence. This indicated to me that based on the dozen vehicles I saw in the driveway, Renee and Stephen couldn't possibly know or keep an accurate account of how many juveniles were in the residence. This added to my concern that if there were juveniles that had overconsumed alcohol, they most likely wouldn't be aided because of the volume of juveniles in the residence."

- "While Cpl. Tomasetti and Ofc. Ayotte walked Renee towards the police cruisers, I positioned myself near the southeast corner of the residence to maintain the best angle to monitor the residence in the event of anybody

exiting and running away from the residence. I did this to prevent intoxicated juveniles from putting their safety at risk. Potential risk factors outside for intoxicated juveniles included being incapacitated outside in very cold weather, running into the woods and getting lost in very cold weather, or tripping and injuring themselves from dizziness or blurred vision."

165.   Officer Ayotte wrote several contradictory and self-serving statements in his report in a post-hoc attempt to justify the officers' behavior by claiming that the children in the home were in danger, including:

- Upon arrival, "I thought of the Wedly V Kingston case, where the NH Supreme court ruled that teenagers released after drinking and driving present a foreseeable threat to public safety. Based on the number of cars I observed, I felt it was unlikely everyone would be staying the night in the house. Based on the way the call was dispatched, I was concerned there would be young drivers leaving the party, who were possibly intoxicated, and the situation required further investigation to ensure the safety of those at the party and the general public. I thought of the Wedly V Kingston case, where the NH Supreme court ruled teenagers released after drinking and driving present a foreseeable threat to public safety. I see this current investigation as mitigating a foreseeable public safety concern of underage drivers leaving this party in an analogous situation."

- While questioning Mr. Legro, "Legro was the only adult I have seen up to this point. Legro was obviously much older than the individuals I had

observed, and appeared to be under the influence. This increased my concern that there was no attentive adult supervision."

166. In his real time conversation with Officer Papadopoulos, Corporal Tomasetti admitted that he was "not super comfortable walking around this entire house just for a couple kids who may be drinking, because that's all we have right now."

167. When Corporal Tomasetti made this admission, the officers had already searched the Plaintiffs' curtilage, shined flashlights in the windows, opened the door to Plaintiffs' home, forced entry into Plaintiffs' home twice, arrested both Plaintiffs, and assaulted both plaintiffs.

168. Nonetheless, Corporal Tomasetti resumed a curtilage search of Plaintiffs' home and directed the officers to do the same.

169. At 10:34:09 p.m., Corporal Tomasetti called Sergeant Eric Bredbury to discuss his concerns about the search. Corporal Tomasetti told Sergent Bredbury, "I don't see any beers or alcohol … I am not entirely comfortable going through the house without some kind of warrant, what do you think on that?"

170. Sergeant Bredbury's response cannot be heard on the body-worn camera.

171. After Sergeant Bredbury said something, Corporal Tomasetti said, ""When I say probable cause, what I mean is that we got a call that there was an underage party, that's just a call I understand that, but when I get here, all the kids look out the window at my cop car and me with my flashlight and nearly sprint from one side to the other and hide. We made contact with a homeowner, homeowner is impaired, they ended up resisting arrest after they requested their ID I guess, I wasn't here for that specific part but..."

172. Corporal Tomasetti was shining his flashlight in the windows of Plaintiffs' home while he explained to Sergeant Bredbury what he meant by "probable cause," and continued, "there

are red solo cups, now that I look through the window here, there's some shot glasses, stuff like that, so I believe I have probable cause to believe there's some kind of underage party here going on but ... that's just me. I'm not comfortable looking through the house for all these kids that may or may not be under the influence."[10]

173.    The below image is a screenshot from Corporal Tomasetti's body-worn camera at 10:36:33 p.m. which shows what Corporal Tomasetti was describing to Sergeant Bredbury (and what he falsely wrote in his report he had seen when he knocked on the front door), a small number of red solo cups stacked among other items near a sink, and three empty, dry shot souvenir glasses displayed on the mantle behind the sink:



_____

[10] As described in Paragraphs 20 and 21 above, Corporal Tomasetti falsely wrote in his report that he saw these items while knocking on Plaintiffs' front door moments after he arrived at the residence.

174.    The window depicted above, through which Corporal Tomasetti saw the items he claimed to have seen through the home's front door, is located on a separate side of the house.

175.    Corporal Tomasetti continued discussing probable cause with Sergeant Bredbury, and admitted, "I'm not comfortable looking through the house for all these kids that may or may not … um … be under the influence."

176.    Corporal Tomasetti further expanded upon his view of probable cause: "To me, the threshold for entering the residence and searching it is higher. There's more of a threshold. Maybe that's my misunderstanding, but … yanno, searching the house seems a bit … I can't just go in the house because I have probable cause to believe there's an underage party going on in there, can I? I'd need a search warrant … Yes, based on everything I saw. The kids wouldn't just run for no reason. The parents wouldn't be drunk, the house wouldn't smell like the odor of an alcoholic beverage, but that doesn't give me the ability to just go inside this house ... at least I don't think it does, I could be very wrong..."

177.    After hanging up with Sergeant Bredbury, at 10:42:09 p.m., Corporal Tomasetti announced, "It is too cold for this shit."

178.    At 10:45:17 p.m., Corporal Tomasetti received a phone call from Detective Alyssa Raxter.

179.    Corporal Tomasetti explained to Detective Raxter the same concerns he had explained to Sergeant Bredbury.

180.    At 10:48:00 p.m., after hanging up with Detective Raxter, Corporal Tomasetti told Officer Ayotte, "I don't feel comfortable just going in this house because we believe there's kids in here drinking, so, we'll see."

181.    At 10:49:47 p.m., Corporal Tomasetti received another call from Detective Raxter.

182.    Corporal Tomasetti told Detective Raxter, "The only reason I even ask is cause it has to do with alcohol and kids underage potentially, that's the only reason I'm like, ah, I don't feel comfortable really just leaving, but … at the same time I don't feel comfortable just going in the house and searching, do you know what I'm saying?"

183.    In his report, Corporal Tomasetti wrote that Detective Raxter told him she had spoken to Detective Sergeant Adam Batstone, who advised her that Corporal Tomasetti should call the on-call supervisor.

184.    At 10:51:01 p.m., Corporal Tomasetti called the on-call supervisor, Chief Kristian Kelley.

185.    Corporal Tomasetti began the phone call by saying, "Hey Chief, it's Logan, hey, hey, my bodycam's on…"

186.    10:52:21 p.m., Corporal Tomasetti looked inside a window of the home and told Chief Kelley, "And actually as I look in the living room right now, there's a few Pumpkinhead beers, it looks like…"[11]

187.    Corporal Tomasetti told Chief Kelley, "I do not feel comfortable just going inside the house, based on all the information that I have, and searching it … Yeah, my concern, so, and again, I might be thinking too much into it, we'd be searching for underage individuals who are impaired. My concern and the reason I'm even calling is because it could involve impaired individuals under the age of 21, and possibly, not sure, but under the age of 18. And I just wanted to get a second opinion before I either leave or post someone up and call Raxter back for a search warrant."

_____

[11] As described in Paragraphs 32 and 33 above, Corporal Tomasetti falsely wrote in his report that he saw these beers before he called Renee Legro, half an hour earlier, and the living room was marked "off-limits" to the children with Halloween "caution" tape, as was the upstairs of the home.

188. While Corporal Tomasetti was on the phone with his superiors, Ms. Legro, who was alone in a cruiser, asked Officer Papadopoulos if she could use the restroom, and informed him that she believed she had a Urinary Tract Infection.

189. Officer Papadopoulos told Ms. Legro, "You're going to have to hold it for the time being."

190. Officer Papadopoulos instead called an ambulance for Ms. Legro.

191. Ms. Legro told the officers that she had PTSD related to being in an ambulance, because the last time she had been in an ambulance was when she had been mauled by two dogs while she was pregnant and suffered severe traumatic injuries.

192. As EMTs who had arrived on the scene evaluated Ms. Legro, at 11:00:58 p.m., Corporal Tomasetti approached Officer Ayotte and asked him, "Hey Nate, what did this guy do to get a resisting, what happened exactly?"

193. Officer Ayotte responded, "He shut the door in our face while we were talking to him, says I'm done and turns around and shuts the door in our face, I put my foot in there and he turns around and he all..."

194. Ms. Legro was experiencing severe emotional distress caused by the officers' assaults and unconstitutional conduct.

195. Ms. Legro was transported to the ambulance.

196. At 11:03:35 p.m., as EMTs were helping Ms. Legro out of the cruiser, Corporal Tomasetti said to EMTs, in front of Ms. Legro, "If I touch her she's gonna spaz the fuck out."

197. Ms. Legro was handcuffed and strapped to a stretcher.

198. Corporal Tomasetti described Ms. Legro's manifestation of emotional distress and PTSD symptoms while she was being brought to the ambulance cruelly in his report, writing that

"Renee had a difficult time controlling her emotions, it was similar to a child throwing a temper tantrum. Renee appeared to be faking a panic attack … Renee appeared to have some sort of mental illness, which is why I tried to be so accommodating with her."

199. At 11:05:17 p.m., Corporal Tomasetti received a call from Deputy Chief Dustin Parent, and went into his cruiser to talk on the phone.

200. Corporal Tomasetti told Deputy Chief Parent, about the arrest of Mr. Legro, "Nate and Angelo were speaking with him, he said I don't want to talk to you, shut the door, and I guess that's … haven't gotten that far yet but seems like that's when they grabbed on to him and he started resisting ... now, uh, you know, I, I, I, you know, that may, you know, uh... but, uh, I think that's for another day right now."

201. Corporal Tomasetti further explained to Deputy Chief Parent – in direct contradiction to what he wrote in his report – "I saw solo cups, a shot glass, and some sodas ... a few minutes after we spoke with [Ms. Legro]. This was after, but I did see an alcoholic beverage outside the residence, and then a couple it looked like Pumpkinheads inside. But I did not see that at the time we were speaking with her, I only saw the things I mentioned previously."

202. Corporal Tomasetti's statements to Chief Parent confirm that he did not see the Pumpkinhead beer cans when he claimed to have seen them in his post-hoc report, and that what he wrote in his report about when he saw the beer cans was false.

203. Corporal Tomasetti told Deputy Chief Parent, about Ms. Legro, "She wouldn't, uh, identify herself[12], um, for a potential – a criminal investigation."

---

[12] As described in paragraphs 29 and 112-115 above, at 10:21:05 p.m., dispatch announced over the radio to the officers, in response to a query made by Corporal Tomasetti, that the house is owned by Renee Legro, and at 10:26:23 p.m., after Mr. Legro had been arrested and his elbow was broken, and before he was brought outside to a police cruiser, Ms. Legro entered the foyer of the home where Mr. Legro and the officers were standing and Corporal Tomasetti asked her, "Are you Renee?" to which Ms. Legro responded, "Yes."

204.     At 11:12:06 p.m., after ending the call with Deputy Chief Parent, Corporal Tomasetti said to himself, "God damn it."

205.     At 11:12:08 p.m., Corporal Tomasetti called Sergeant Bredbury, and told him, "Yeah Raxter called I guess Sergeant Batstone and he said to do a search warrant for kids who may be impaired is a bit of a stretch."

206.     At 11:12:48 p.m., after ending the call with Sergeant Bredbury, Corporal Tomasetti said to himself again, louder this time, "God damn it."

207.     While Corporal Tomasetti was in his cruiser, talking to his superiors and cursing to himself, Officer Papadopoulos resumed his curtilage search, shining his flashlight in the windows of vehicles parked in Plaintiffs' driveway and inside a shed.

208.     At 11:12:35 p.m., Officer Papdopoulos, who was standing in the driveway near the side of Plaintiffs' house, walked around the house and towards three children, who were walking towards Officer Papadopoulos.

209.     From 10:29:04 p.m., when the officers pulled Ms. Legro out of her home, until 11:12:35 p.m., when three children approached Officer Papadopoulos – a span of over 42 minutes -- all of the children who were inside Plaintiff's home were without an adult, since Plaintiffs had been removed from the home and assaulted, and were essentially under siege as the officers prowled the curtilage and peered into windows.

210.     At 11:12:42 p.m., the following exchange occurred:

[CHILD]:                          "Hello
OFFICER PAPDOPOULOS: "Hey."
[CHILD]:                          "Hey, what's up?"
OFFICER PAPDOPOULOS: "What's going on?"
[CHILD]:                          "Um…"
OFFICER PAPDOPOULOS: "Officer Papadopoulos, Gilford PD, just so you know I'm
                                   recording, Okay?

[CHILD]:                    "Sam Kelley, I'm Kris's son. I just wanna let you know, there's a bunch of sober kids sitting in there. We're gonna speak for ourselves, we didn't touch a drop of alcohol, we just want to get out of here."

211.    The child who approached Officer Papdopoulos and introduced himself as "Sam Kelley," and "Kris's son," was Samuel Kelley, Chief Kelley's son.

212.    At 11:15:30 p.m., a number of other children exited the home to join Samuel Kelley and his two friends.

213.    Officer Ayotte instructed the children to line up.

214.    The officers began to allow the children who had lined up to take a breathalyzer test.

215.    Officers told the children that if they blew a 0.00, the officers would call their parents, and if their parents gave them permission, they could leave.

216.    As Officer Ayotte was speaking with the children, at 11:17:00 p.m., Corporal Tomasetti entered the ambulance with Ms. Legro.

217.    Ms. Legro was in obvious distress, experiencing severe manifestations of her PTSD symptoms. Ms. Legro was confined to the stretcher and was not assaultive or combative.

218.    At 11:17:20 p.m., Corporal Tomasetti told Renee, "Ma'am, you gotta calm down, you're a grown woman, sit up! Sit up!"

219.    Ms. Legro sat up as instructed.

220.    After sitting up, Ms. Legro explained to the EMTs that she was suffering from PTSD because she had been mauled while she was pregnant.

221.    After Ms. Legro sat up, Corporal Tomasetti took a phone call from Deputy Chief Parent.

222. At 11:18:57 p.m., Corporal Tomasetti, while still on the phone with Deputy Chief Parent, walked toward Ms. Legro, who was sitting up as he'd instructed her, grabbed her arms, which were handcuffed behind her back, and slammed her back down onto the stretcher.

223. The below images are screenshots taken from Corporal Tomasetti's body-worn camera at 11:18:59 p.m. and 11:19:00 p.m., which show Corporal Tomasetti slamming Ms. Legro back down onto the stretched after he'd asked her to sit up:





224.   After slamming her down, Ms. Tomasetti left his hand on Ms. Legro for several moments after she pleaded with him take his hand off of her.

225.   The below image is a screenshot taken from Corporal Tomasetti's body-worn camera at 11:19:32 p.m., which shows his cell phone in his right hand, engaged in an ongoing, unmuted phone call with Deputy Chief Parent:



226.    Corporal Tomasetti asked the EMTs to strap Ms. Legro into the stretcher "a little more," and then, at 11:19:56 p.m., left the ambulance.

227.    After leaving the ambulance, Corporal Tomasetti resumed speaking with Deputy Chief Parent, and at 11:20:10 p.m., said, "the Female is losing her mind in the ambulance."

228.    At 11:21:13 p.m., Corporal Tomasetti told Deputy Chief Parent, "Yeah, and just as we're talking and a little bit before we started talking just now a bunch of kids have come out and they're with Nate and Angelo right now. So it sounds like most of them came out, I'll talk with some of them, it seems like Sam is here as well, just a heads up ... but yeah, looks like most of them are out. He ... I have not seen him, we're talking with him ... as far as I know he's sober, yes, Angelo told me ... he didn't appear to be impaired, so ... but I have not seen any of them yet, I'm

with the ambulance and there's a guy getting rowdy with them, so like ... it's kind of a shit show if I'm being honest."

229.   After this phone call with Deputy Chief Parent Corporal Tomasetti joined Officer Papadopoulos with the children and instructed Officer Ayotte to join Ms. Legro in the ambulance, where she was experiencing symptoms of her severe emotional distress and PTSD.

230.   Ms. Legro was transported from the ambulance to a cruiser, where Officer Ayotte left her.

231.   At 11:29:18, p.m., after questioning some of the children and preparing a breathalyzer test for Samuel Kelley, Corporal Tomasetti announced, "God damn, it's cold out here. It's too cold for this."

232.   At 11:34:33 p.m., Corporal Tomasetti announced to the children and the officers, "Let's uh … let's go inside."

233.   Seconds later, the officers ushered the children back inside Plaintiffs' house and entered the house themselves.

234.   The officers did not have a warrant to enter the house.

235.   At 11:35:29 p.m., a child asked the officers, "Are y'all allowed to come in here?" Corporal Tomasetti replied, "Yes. Just head inside. We're good. I wouldn't be coming in if we couldn't."

Illegal Search

236.   Inside the home, the officers questioned and tested the children and spoke to their parents.

237.   At 12:15:16 a.m. on November 1, 2025, the officers began a warrantless search of the entire house.

238. At 12:15:22 a.m., Corporal Tomasetti radioed, "321 and I are gonna search the residence."

239. The officers spent the next hour and 43 minutes searching the entire home and questioning and testing children.

240. The officers did not identify or seize any evidence relating to alleged underage drinking.

241. 28 of the 32 children questioned or tested blew a 0.00 or showed no signs of intoxication and were ultimately allowed to leave.

242. The officers issued summonses to four children for unlawful possession and intoxication.

243. None of these four children were served alcohol in the house.

244. The house contains a liquor cabinet with an electronic lock. The records from the liquor cabinet demonstrate that it was not opened that evening.

245. Corporal Tomasetti wrote in his report, "A large majority of the individuals I dealt with were not impaired."

### Post Arrest Conduct

246. Plaintiffs were transported to Gilford Police Station.

247. Plaintiffs were both charged with Resting Arrest and Obstructing Governmental Operations.

248. Plaintiffs requested the services of a bail commissioner and were released on personal recognizance bail.

249.    After Plaintiffs were released by the bail commissioner, they were transported to Concord Hospital – Laconia.  There, Plaintiffs were treated for their injuries. Plaintiffs' medical records do not indicate any signs of impairment.

250.    Arraignment was scheduled for December 18, 2025.

251.    Criminal complaints were prepared and filed with the Laconia Circuit Court. Plaintiffs were both charged with resisting arrest contrary to RSA 642:2, a Class A misdemeanor, and obstructing governmental operations contrary to RSA 642:1, a Class B misdemeanor. Officer Papadopoulos signed the complaints.

252.    Plaintiffs entered not guilty pleas and waived arraignment.

253.    Trial was scheduled for February 24, 2026.

254.    On January 5, 2026, the State nol prossed all of the complaints.

255.    Plaintiffs were forced to hire legal counsel to represent them in the criminal matters that followed their illegal arrests.

256.    As a result of the unlawful arrests and baseless criminal complaints and media coverage that followed, the Plaintiffs were subjected to great humiliation and embarrassment in their community where they have lived as law abiding citizens for ten years.

<u>False Reports</u>

257.    Officer Papadopoulos entered his report at 2:53 a.m. on November 1, 2025.

258.    Corporal Tomasetti entered his report at 7:02 p.m. on November 1, 2025.

259.    Officer Ayotte entered his report at 10:57 p.m. on November 1, 2025.

260.    The officers' reports following Plaintiffs' arrests contained a litany of false statements, as partially detailed above.

261.    Many of the officers' false statements in their reports are directly contradicted by the body-worn camera footage.

262.    On December 11, 2025, Gilford Police Department Prosecutor Andrew Yourell ("Attorney Yourell") sent the officers an email[13] in which he wrote "… I am in the process of reviewing your reports and I was hoping we could touch base, either as a group or individually. I want to discuss the reports because they'll need to be finalized and approved soon so that I can get discovery out. The Legros have hired an attorney and it's almost certain that when he gets the discovery, they will file to suppress all evidence obtained …"

263.    On December 18, 2025, Corporal Tomasetti emailed Attorney Yourell and Sergeant Bredbury, "Just a heads up, I advised Officer Ayotte and will advise Officer Papadopoulos that their narratives need to be corrected and complete at the end of their next shift in reference the large Halloween party."

264.    On December 22, 2025, Corporal Tomasetti emailed Officer Ayotte and Officer Papadopoulos, with Attorney Yourell CC'd, stating, "Gentlemen, I know we talked last week about having this arrest report updated with corrections prior to ending shift today…."

265.    Corporal Tomasetti modified his report on December 31, 2025, at 7:05 p.m.

266.    At 7:07:49 p.m. on December 31, 2025, Corporal Tomasetti emailed Attorney Yourell, Sergeant Curtis Mailloux, and Sergeant Richard Brewer, in response to an inquiry about the reports, "I completed mine. Angelo's looks like he corrected his as well. I emailed Nate to correct his, as there is still a correction needed to be made."

267.    Officer Papadopoulos modified his report on December 31, 2025, at 6:33 a.m.

268.    Officer Ayotte modified his report on January 1, 2026, at 8:01 a.m.

269.    Each Plaintiffs' charges were nol prossed on January 5, 2026.

---

[13] The emails referenced herein are incorporated by reference in full herein and will be referenced and quoted throughout this complaint, as they are central to the claims.

Violations of Written Department Policy

270.    The Gilford Police Department's Use of Force Policy[14] contains the following provision: "All uses of force must be objectively reasonable. Officers must use only that force which reasonably prudent officers would use under the same or similar circumstances."

271.    The Use of Force Policy further states that "Officers who use excessive and/or unauthorized force shall be subject to discipline … Accordingly, GPD will thoroughly review and/or investigate all uses of force by officers to ensure compliance with all legal requirements, as well as this policy."

272.    The Use of Force Policy further states, "When possible, officers shall allow individuals time to submit to arrest before utilizing force," and, "Justifications for the uses of force are limited to facts known or perceived by officers at times such force is used."

273.    The Use of Force Policy requires that "Force shall not be used against handcuffed persons except as objectively reasonable so as to prevent immediate and/or imminent bodily harm to officers or persons or where physical removal is necessary to overcome passive resistance."

274.    Under the Use of Force Policy, serious bodily injury is defined as "injury … that causes serious or permanent disfigurement, or results in long-term loss or functioning impairment of any bodily organs/parts." Further, "Any time people have visible injuries or complain about being injured as a result of force used against them, officers must take appropriate actions to provide medical care for them."

275.    The Use of Force Policy also requires that officers report uses of force "on the Department created *Use of Force Report Form* whenever uses of force on persons are above the level of un-resisted handcuffing. Such forms include reporting from hands-on control techniques

---

[14] The policies referenced herein are incorporated by reference in full herein and will be referenced and quoted throughout this complaint, as they are central to the claims.

to actual firearm discharges." For Patrol Officers, "report forms completed shall be completed, printed out, signed, dated, and submitted directly to the supervisor on duty by the end of shift on duty use of force was exercised."

276. Upon information and belief, despite the directives of the Use of Force Policy, none of the officers filled out a Use of Force Report Form or otherwise reported their uses of force against Plaintiffs.

277. The officers' actions as described above violated the Use of Force Policy, which was set into effect on June 1, 2024, and was the policy in effect at all times relevant to this complaint.

278. Upon information and belief, the Gilford Police Department has not conducted a use of force review related to any of the events detailed within this complaint.

279. The Gilford Police Department's Search and Seizure Policy states that "It shall be the policy of the Gilford Police Department (GPD) that all officers thoroughly understand the basic constitutional and statutory provisions involved in the searches and seizures of person and/or property…"

280. The Search and Seizure Policy instructs that "If there are any doubts as to whether certain areas are considered curtilage then warrants should be obtained."

281. The officers' actions as described above violated the Search and Seizure Policy, which was set into effect on June 1, 2024, and was the policy in effect at all times relevant to this complaint.

282. The Gilford Police Department's Paperwork Completion Policy states that arrest reports "shall include all pertinent and relative information in order to ensure report accuracy and completion."

283.    The Paperwork Completion Policy further requires that "For those individuals scheduled to be arraigned, their pertinent court paperwork must be completed immediately."

284.    The officers' actions as described above violated the Paperwork Completion Policy, which was set into effect on June 1, 2024, and was the policy in effect at all times relevant to this complaint.

285.    The Gilford Police Department's Arrest Procedures Policy states:

**C. Arrest Without a Warrant**

An arrest by a peace officer without a warrant on a charge of a misdemeanor or a violation is lawful whenever:

1. The officer has probable cause to believe that the person to be arrested has committed a misdemeanor or violation in his presence; or
2. The officer has probable cause to believe that the person to be arrested has committed a misdemeanor or violation, and, if not immediately arrested, such person will not be apprehended, will destroy, or conceal evidence of the offense, or will cause further personal injury or damage to property.
3. The Officer has probable cause to believe that the person to be arrested has within the past 12 hours committed abuse as defined in RSA 173-B:1, I against a person eligible for protection from domestic violence as defined in RSA 173-B:1, has within the past 12 hours violated a temporary or permanent protective order issued under RSA 173-B or RSA 458:16 by committing assault, criminal trespass, criminal mischief or another criminal act, or has within the last 12 hours violated stalking provisions under RSA 633:3-a

…

*Probable cause* means that the facts within the officer's knowledge were sufficient to allow a reasonable and prudent person to believe the suspect arrested had committed or was committing a crime.

Each officer shall be able to point to specific factors which lead to an arrest without a warrant. Example of such factors are:

1. Did he/she see the crime being committed?
2. Did he/she see the person run away?
3. Did he/she receive prompt and direct replies to questions, or was the suspect vague and confused?
4. Has he/she had experience in similar situations?

5. Did he/she receive information from other people, and if so, was he/she certain of the reliability of that person and the information received?

286.    The Arrest Procedures Policy further states:

**G. Officer Conduct at Time of Arrest**

At the time of arrest, unnecessary conversation shall be avoided and any orders or statements to the person(s) arrested shall be clear and brief.

1. The arresting officer shall identify her/himself as a police officer, except in an emergency situation. Therefore, it is a good idea for the officer to carry his/her credentials when possible.
2. Whenever possible, the person(s) being placed under arrest shall be expressly informed of the fact. The officer shall state as follows: "Police Officer. You are under arrest."
4[15]. An officer shall state the reason for the arrest and allow examination of the arrest warrant, if any, by the person arrested or when the officer is met with resistance.

287.    The officers' actions as described above violated the Arrest Procedures Policy, which was set into effect on May 18, 2025, and was the policy in effect at all times relevant to this complaint.

288.    The Gilford Police Department's Mental Illness Policy states that "Mental illness is a disease, and those who suffer from mental illness need and deserve empathy, respect, and assistance."

289.    The Mental Illness Policy further states:

**B. De-escalation Techniques**

1. While assessing for mental illness and determining the best response, an officer should use the following de-escalation techniques:

a. Be alert. Maintain a safe distance; do not crowd the person; use non-threatening body language; do not touch or rush the person unless an emergency arises.
b. Gain eye contact with the person directly by saying, calmly and politely, "Look at me." If you learn their name, use it.
c. Speak calmly, softly, and in simple short phrases that are easy to understand.
d. Be patient during what may be a long encounter.

---

[15] The Policy skips number 3.

e. Look for personal identification, including wrist tags or neck chains. If the person shares information about a caregiver, request dispatch calls them.
f. Keep onlookers calm and the commotion down. Avoid loud sounds and over-stimulation. If possible clear the area of onlookers.

290. The Mental Illness Policy dictates that "Officers should be aware that an arrest or protective custody could trigger an anxiety response and escalate matters. Transporting patients with mental illness requires officers to use caution. When applying handcuffs officers should explain the necessity of the restraints and do so in a calm manner."

291. The officers' actions as described above violated the Mental Illness Policy, which was set into effect on June 1, 2024, and was the policy in effect at all times relevant to this complaint.

292. The Gilford Police Department's Duty to Intervene Policy imposes upon officers a duty to intervene:

**B. Duty to Intervene**

All GPD employees must recognize and act upon the affirmative duty to intervene for the purposes of preventing or stopping any colleague from conducting acts that are unethical or violate laws, policies, and/or procedures (e.g., discourteous language, excessive force, falsifying documents, fraud, harassment, inappropriate behavior, sexual misconduct, theft, etc.). Intervention may be verbal and/or physical in nature. A failure to intervene may subject employees to disciplinary actions up to and including possible termination.
…

**C. Employee Required Action**

GPD employees witnessing misconduct and/or other problematic behavior shall:

1. If assistance or medical aid is required, ensure that medical attention has been rendered and, if needed, EMS assistance is immediately requested.
2. Whenever possible, take preventative approaches if behaviors observed suggest that others are about to conduct inappropriate or unethical acts. This can be done by examining the circumstances surrounding incidents in order to determine appropriate forms of intervention, and/or intervening either verbally or physically depending upon circumstances.
*Example: While providing back-up during a traffic stop for a minor motor vehicle*

- 58 -

*violation you notice another officer raising his/her voice and becoming increasingly agitated with the operator despite the operator's cooperative demeanor. In order to prevent potential escalation, you could call the officer's attention, when safe to do so, in order to break the agitation; walk-up next to the officer and ask a follow-up question of the operator so as to slow down the interaction and to allow a chance for the officer to collect him/herself; or ask the officer to approach you away from the vehicle for the purposes of diffusing the situation.*

3. Take active approaches to intervene or stop misconduct or unethical behaviors when such conduct is being committed by others. If verbal interventions are not sufficient to stop such acts, then coming between offending individuals and others involved is warranted.

*Example: You observe an officer strike another without any reason. When appropriate to do so, tell the officer you will take over the matter at hand and have him/her step aside. If necessary, step in between the officer and the individual or hold the officer back in order to stop him/her from inflicting more unnecessary force.*

4. Immediately notify a supervisor/OIC after any type of interaction has been conducted and when safe to do so.

5. Document incidents in which physical interventions were performed

293. The officers' actions as described above violated the Duty to Intervene Policy, which was set into effect on June 1, 2024, and was the policy in effect at all times relevant to this complaint.

294. The Gilford Police Department's Reports of Misconduct By Officers Policy defines misconduct to include "assault," and "excessive and illegal uses of force as defined by the New Hampshire criminal code."

295. The Reports of Misconduct By Officers Policy states that "It shall be the duty of all law enforcement officers who observe misconduct by other law enforcement officers to notify the GPD Chief of Police (or his/her designee) in writing immediately or as soon as is practicable after observing such misconduct."

296. The officers' actions as described above violated the Reports of Misconduct By Officers Policy, which was set into effect on May 1, 2024, and was the policy in effect at all times relevant to this complaint.

297.    Upon information and belief, the Gilford Police Department has not conducted an internal investigation related to any of the events detailed within this complaint.

Harm Suffered

298.    As a direct and proximate cause of the Defendants' unlawful conduct, Mr. Legro has suffered significant damages. He was subject to a false arrest which was not supported by probable cause, depriving him of his liberty. He suffered a broken elbow and bilateral arm and wrist injuries due to the officers' use of excessive force. Mr. Legro has suffered incredible physical and emotional pain that remains an issue in his daily life.

299.    As a direct and proximate cause of the Defendants' unlawful conduct, Ms. Legro has suffered significant damages. She was pulled out of her house and made subject to a false arrest which was not supported by probable cause, depriving her of her liberty. She was assaulted by officers, suffered extensive physical injury, and was made to experience severe emotional distress and a reignition of significant symptoms of PTSD. Ms. Legro has suffered incredible physical and emotional pain that remains an issue in her daily life.

**COUNT I**
**42 U.S.C. § 1983 – FOURTH AMENDMENT; EXCESSIVE FORCE**
**(AGAINST THE OFFICERS)**

300.    All prior paragraphs are incorporated.

301.    The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures, and the use of excessive force.

302.    The Fourth Amendment is applied to the states through the Fourteenth Amendment.

303.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

304.   The right to be free from unreasonable seizure in the form of an officer's use of excessive force in effecting an arrest or investigatory stop is a clearly established right under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010).

305.   A police officer is not entitled to qualified immunity when he employs force that is unreasonable under all the circumstances. *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009) (citing *Graham*, 490 U.S. at 396). Whether the force applied is reasonable depends on the totality of the circumstances, and the factors to be considered include "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019) (citing *Graham*, 490 U.S. at 396).

306.   When the officers arrived at Plaintiffs' home, officers did not have probable cause to suspect Plaintiffs of committing any crime. Plaintiffs were clearly unarmed and otherwise did not give any indication that they were a threat to the safety of the officers or others present, and made no attempt to evade or resist officers.

307.   The officers unreasonably and intentionally committed acts and omissions while acting under the color of state law that violated Mr. Legro's rights as guaranteed by the United States Constitution by subjecting him to an unreasonable seizure and applying excessive force, where, among other physical acts, the officers forced their way inside Mr. Legro's home, initiated contact with Mr. Legro and applied significant force to Mr. Legro's arms without legitimate reason or justification, causing him serious injury including a broken elbow.

308.   The officers unreasonably and intentionally committed acts and omissions while acting under the color of state law that violated Ms. Legro's rights as guaranteed by the United

States Constitution by subjecting her to an unreasonable seizure and applying excessive force, where, among other physical acts, the officers forced their way inside Ms. Legro's home, initiated contact with Ms. Legro, pulled her from her home, pushed her against her door and outdoor wall, and bent and twisted Ms. Legro's wrists and arms without legitimate reason or justification, causing her serious mental and physical injury.

309.    A reasonable person in the officers' position would have known that their acts and omissions violated clearly established law guaranteeing the right to be free from excessive force and unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution.

310.    The officers therefore violated Plaintiffs' civil rights to be free from unreasonable seizures, free from bodily harm, and free from the excessive use of force. *See, e.g., Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (citing *Graham* 490 U.S. at 396) (force used was excessive and unreasonable where, without warning or explanation, police deployed more force than required to respond to minor infraction and because "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest"); *Gray*, 917 F.3d at 9 (single taser use to subdue nonviolent individual could be excessive); *Parker v. Gerrish*, 547 F.3d 1, 10 (1st Cir. 2008) (even where plaintiff mounted some resistance to arrest, officer's use of taser could be excessive).

311.    Plaintiffs suffered serious bodily injury, emotional distress, loss of reputation, and a loss of fundamental rights and liberty as a result of these actions by the officers.

## COUNT II
### 42 U.S.C. § 1983 – FOURTH AMENDMENT; FALSE ARREST
### (AGAINST THE OFFICERS)

312.    All prior paragraphs are incorporated.

313.    The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.

314.    The Fourth Amendment is applied to the states through the Fourteenth Amendment.

315.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

316.    The right to be free from unreasonable seizure in the form of arrest and detention without probable cause due to the use of false statements or material omissions by a police officer to establish probable cause is a clearly established right under the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978); *Cullen v. Janvrin*, No. 14-cv-110-PB, 2015 WL 7312886, at *5 (D.N.H. Nov. 19, 2015).

317.    A police officer is not entitled to qualified immunity:

> if an officer submitted an affidavit that contained false statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, not only is his conduct the active cause of the illegal arrest, but he cannot be said to have acted in an objectively reasonable manner. Thus, defendant would not be granted immunity if he was issuing false statements to establish the appearance of probable cause.

*Phelan v. Thompson*, 889 F. Supp. 517, 520 (D.N.H. 1994) (quoting *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985)). This is also so, when the defendant officer omits a material fact or facts in a sworn affidavit submitted to a court causing the court to act "upon the false picture painted by defendant of plaintiff . . . ." *Phelan*, 889 F. Supp. at 522.

318.    New Hampshire law does not allow an officer to arrest an individual for refusing to provide his or her date of birth.  "An officer may request the person's name and address, but the officer shall not arrest the person based solely on the person's refusal to provide such information." RSA 594:2.

319. The officers violated Plaintiffs' Fourth Amendment rights not to be subjected to false arrest by causing Plaintiffs to be charged and detained without probable cause, in that the officers violated New Hampshire law and arrested the Plaintiffs contrary to RSA 594:2 and produced reports following the arrests of Plaintiffs which contained material false statements and omitted material exculpatory information, resulting in Plaintiffs' formal charges on December 4, 2025.

320. Plaintiffs suffered serious bodily injury, emotional distress, loss of reputation, and a loss of fundamental rights and liberty as a result of these actions by the officers.

**COUNT III**
**42 U.S.C. § 1983 – FOURTH AMENDMENT; MALICIOUS PROSECUTION**
**(AGAINST THE OFFICERS)**

321. All prior paragraphs are incorporated.

322. The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.

323. The Fourth Amendment is applied to the states through the Fourteenth Amendment.

324. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

325. The right to be free from unreasonable seizure in the form of arrest and detention without probable cause due to the use of false statements or material omissions by a police officer to obtain a warrant is a clearly established right under the Fourth Amendment. *Franks*, 438 U.S. at 171-72; *Cullen* 2015 WL 7312886, at *5.

326. A police officer is not entitled to qualified immunity:

if an officer submitted an affidavit that contained false statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, not only is his conduct the active cause of the illegal arrest, but he

cannot be said to have acted in an objectively reasonable manner. Thus, defendant would not be granted immunity if he was issuing false statements to establish the appearance of probable cause.

*Phelan*, 889 F. Supp. at 520 (quoting *Olson*, 771 F.2d at 281). This is also so, when the defendant officer omits a material fact or facts in a sworn affidavit submitted to a court causing the court to act "upon the false picture painted by defendant of plaintiff . . . ." *Phelan*, 889 F. Supp. at 522.

327.    The officers' reports, as well as the criminal complaints signed by Officer Papadopoulos, intentionally or recklessly contained material misstatements and/or omitted material exculpatory information.

328.    The prosecution was with malice as set forth above and elsewhere in the complaint.

329.    The prosecution was terminated in Plaintiffs' favor in the form of a dismissal.

330.    A "Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49 (2022).

331.    The actions of the officers were wanton and reckless as no reasonable officer under the circumstances would have believed the affidavit submitted under oath was a true and factual representation of the underlying conduct.

332.    The officers violated Plaintiffs' Fourth Amendment rights not to be subjected to false arrest by causing Plaintiffs to be charged and detained without probable cause, in that the officers produced reports following the arrests of Plaintiffs which contained material false statements and omitted material exculpatory information, resulting in Plaintiffs' formal charges on December 4, 2025.

333. Plaintiffs incurred attorneys' fees and suffered emotional distress, loss of reputation, and a loss of fundamental rights and liberty as a result of these actions by the officers.

**COUNT IV**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT; PROCEDURAL DUE PROCESS (AGAINST THE OFFICERS)**

334. All prior paragraphs are incorporated.

335. The Fourteenth Amendment to the United States Constitution prohibits the deprivation of life, liberty, or property without due process.

336. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

337. The right to receive exculpatory evidence, including impeachment evidence, in order to mount a fair trial is a clearly established right under the Fourteenth Amendment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Bagley*, 473 U.S. 667, 678 (1985).

338. Law enforcement officers have an affirmative disclosure obligation with respect to exculpatory evidence. *Kyles v. Whitely*, 514 U.S. 419, 437-38 (1995); *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).

339. Qualified immunity is not available when an officer violates a constitutional right, and that right is clearly established. "There can be no doubt that, under the line of cases running from *Mooney* and *Pyle* to *Brady*, the law was firmly settled . . . that a law enforcement officer may not deliberately suppress material evidence that is favorable to a defendant." *Drumgold v. Callahan*, 707 F.3d 28, 43 (1st Cir. 2013).

340. A reasonable officer in the position of the officers plainly would have appreciated the wrongfulness of their conduct.

341. The officers violated Plaintiffs' Fourteenth Amendment rights to procedural due process by providing material false information in support of Plaintiffs' prosecution.

342. Plaintiffs incurred attorneys' fees and suffered emotional distress, loss of reputation, and a loss of fundamental rights and liberty as a result of these actions by the officers.

**COUNT V**
**42 U.S.C. § 1983 – *MONELL* CUSTOM AND FAILURE TO TRAIN, DISCIPLINE, AND SUPERVISE**
**(AGAINST THE TOWN OF GILFORD)**

343. All prior paragraphs are incorporated.

344. Under 42 U.S.C. § 1983, municipal defendants are "persons" liable for unconstitutional customs, practices, and policies, and failure to discipline their law enforcement officers.

345. Defendant Town of Gilford has developed an informal "custom" of allowing the use of excessive force, illegal searches, seizures, and entries, the failure to adhere to the standard of probable cause, falsification of evidence, omission of material exculpatory evidence, deliberately making false reports, and failure to follow its written policies -- including, but not limited to, its Use of Force, Search and Seizure, Paperwork Completion, Arrest Procedures, Mental Illness, Duty to Intervene, and Reports of Officer Misconduct Policies -- encouraged, in part, by failing to investigate and discipline those actions by its officers. Those "customs" within the Town of Gilford Police Department are "so widespread as to have the force of law."

346. The Town of Gilford acted with deliberate indifference to the strong likelihood that failing to investigate and discipline the use of excessive force, illegal searches, seizures, and entries, the failure to adhere to the standard of probable cause, falsification of evidence, omission of material exculpatory evidence, deliberately making false reports, and failure to follow its written policies -- including, but not limited to, its Use of Force, Search and Seizure, Paperwork

Completion, Arrest Procedures, Mental Illness, Duty to Intervene, and Reports of Officer Misconduct Policies -- would only serve to ratify and encourage that unconstitutional conduct to continue.

347.    The Town of Gilford knew or should have known that the use of excessive force, illegal searches, seizures, and entries, the failure to adhere to the standard of probable cause, falsification of evidence, omission of material exculpatory evidence, deliberately making false reports, and failure to follow its written policies -- including, but not limited to, its Use of Force, Search and Seizure, Paperwork Completion, Arrest Procedures, Mental Illness, Duty to Intervene, and Reports of Officer Misconduct Policies -- constitute unconstitutional conduct and that failure to investigate and/or discipline for the same would lead to further improper conduct by its employee police officers but, nonetheless, exhibited deliberate indifference to the unconstitutional and illegal conduct.

348.    Specifically, upon information and belief, the Town of Gilford did not conduct any internal investigation into the conduct described throughout this complaint.

349.    The Town of Gilford, specifically, the Chief of Police, the Lieutenant, and the Sergeant, ratified the conduct by bringing charges against Plaintiffs and failing to conduct any internal investigation into the conduct described throughout this complaint even after voluntarily nol prossing the charges.

350.    The Town of Gilford's informal customs of allowing the use of excessive force, illegal searches, seizures, and entries, the failure to adhere to the standard of probable cause, falsification of evidence, omission of material exculpatory evidence, deliberately making false reports, and failure to follow its written policies -- including, but not limited to, its Use of Force, Search and Seizure, Paperwork Completion, Arrest Procedures, Mental Illness, Duty to Intervene,

- 68 -

and Reports of Officer Misconduct Policies -- encouraged, in part, by failing to investigate and discipline those actions by its officers directly resulted in the violation of Plaintiffs' Fourth and Fourteenth Amendment rights.

351. Plaintiffs suffered significant bodily harm, mental harm, loss of reputation, and the loss of fundamental rights and liberty as a result of these actions by the Town of Gilford and are entitled to punitive damages.

## STATE LAW CLAIMS

### COUNT VI
### ASSAULT AND BATTERY
### (AGAINST THE OFFICERS and THE TOWN OF GILFORD)

352. All prior paragraphs are incorporated.

353. The officers intended to cause harmful or offensive contact with Mr. Legro and placed him in imminent apprehension of such contact as they forced their way inside his home, grabbed him, and applied significant force to his arms.

354. The officers intended to cause harmful or offensive contact with Ms. Legro and placed her in imminent apprehension of such contact as they forced their way inside her home, grabbed her, pulled her out of her home, shoved her against her door and outdoor wall, bent and twisted her arms and wrists, threatened her, and continued to assault her outside her home and in the ambulance.

355. Such contact is offensive to a reasonable person.

356. Such contact was not consensual.

357. Such contact was not legally authorized, despite the officers' roles as police officers, because they did not have probable cause to make the arrests.

358.  The Town of Gilford is vicariously liable for its officers' intentional actions. *See Huckins v. McSweeney*, 166 N.H. 176, 182 (2014).

359.  Plaintiffs suffered significant bodily injury and a loss of fundamental rights and liberty as a result of these actions by the officers.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST THE OFFICERS and THE TOWN OF GILFORD)

360.  All prior paragraphs are incorporated.

361.  The officers' illegal searches, seizures, arrests, and assaults of Plaintiffs constituted intentional, reckless, and outrageous conduct that inflicted severe emotional distress upon Plaintiffs.

362.  The officers, or any other actor, would have been substantially certain at the time they perpetrated these actions that they would inflict severe emotional distress upon Plaintiffs.

363.  Plaintiffs did in fact suffer serious physical, emotional, and psychological distress as well as loss of employment as a result of the officers' actions.

364.  The Town of Gilford is vicariously liable for its officers' intentional actions. *See Huckins*, 166 N.H. at 182.

## COUNT VII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST THE OFFICERS and TOWN OF GILFORD)

365.  All prior paragraphs are incorporated.

366.  Plaintiffs claim injury for severe emotional distress caused by the negligent acts committed by defendants including but not limited to the officers' illegal searches, seizures, arrests, and assaults of Plaintiffs.

367.    As a result of the negligence of Defendants, Mr. Legro was caused to suffer and continues to suffer severe emotional distress, and Ms. Legro was caused to suffer and continues to suffer severe emotional distress as well as loss of employment.

## COUNT VIII
## MALICIOUS PROSECUTION
### (AGAINST THE OFFICERS and TOWN OF GILFORD)

368.    All prior paragraphs are incorporated.

369.    Plaintiffs were subject to criminal prosecutions when they were both charged with Resting Arrest and Obstructing Governmental Operations.

370.    Plaintiffs were charged without probable cause due to the officers' direct contravention of statutory law, material false statements and omissions, and lack of rectification of those material false statements and omissions.

371.    The officers acted with malice when they arrested Plaintiffs in direct contravention to statutory law and made material false statements and omissions and failed to correct them.

372.    The actions against Plaintiffs terminated in their favor when they were nol prossed.

373.    The officers could not have reasonably believed, at the time of the acts complained of in this lawsuit, that their conduct was lawful. The actions of the officers were made in an intentional, wanton, or reckless manner.

374.    The Town of Gilford is vicariously liable for the intentional, wanton, or reckless actions of its Officers. *See Huckins*, 166 N.H. at 182.

375.    Plaintiffs incurred attorneys' fees and suffered emotional distress, loss of reputation, and a loss of fundamental rights and liberty as a result of these actions by Defendants.

### DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all issues triable by jury.

- 71 -

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully requests this Court grant the following relief:

A.      Monetary damages on all counts;

B.      Punitive damages for claims arising under 42 U.S.C. § 1983;

C.      Enhanced Compensatory damages for claims arising under New Hampshire common law;

D.      Cost, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b) and New Hampshire law;

E.      All relief available to Plaintiffs under any applicable law; and

F.      Any other relief that this Court deems just or equitable.


Date: May 20, 2026                                      Respectfully submitted,

                                                        Stephen Legro
                                                        Renee Legro
                                                        By Their Attorneys:
                                                        SHAHEEN & GORDON, P.A.

                                                        /s/ *William E. Christie*
                                                        William E. Christie
                                                        NH Bar #11255
                                                        Timothy S. Mainella
                                                        NH Bar #278206
                                                        107 Storrs Street/P.O. Box 2703
                                                        Concord, NH 03302-2703
                                                        (603) 225-7262
                                                        wchristie@shaheengordon.com
                                                        tmainella@shaheengordon.com

                                                        *Attorneys for the Plaintiffs*